**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| JAMES JULIAN, | |
| **Plaintiff,** | |
| **v.** | **Case No. 2:25-cv-02510-HLT-GEB** |
| **KIRKENDALL DWYER II, LLP, et al.,** | |
| **Defendants.** | |

**MEMORANDUM AND ORDER**

Plaintiff James Julian sues Defendant Kirkendall Dwyer II, LLP, plus two other entities, for violations of the Telephone Consumer Protection Act ("TCPA") and the Kansas Consumer Protection Act ("KCPA"). Julian's claims stem from 40 telemarketing calls he received despite being on the no-call list. He alleges the calls were made by or on behalf of Kirkendall through telemarketing agents.

Kirkendall moves to dismiss the TCPA claims. Kirkendall argues Julian's allegations against it are not plausible because there is an "obvious alternative explanation" that the calls were made not by it. Kirkendall also argues that the KCPA claim fails because the calls were about insurance, and consumer transactions involving insurance contracts are not covered under the KCPA.

The Court denies Kirkendall's motion. Julian has plausibly connected Kirkendall to the calls, and Kirkendall's "obvious alternative explanation" is not so obvious that it overwhelms Julian's allegations. Kirkendall also has not shown that the KCPA claim fails as a matter of law.

## I.    BACKGROUND

The following facts are taken from the well-pleaded allegations in the complaint and are assumed to be true. The Court focuses on the allegations that relate to Kirkendall.

Julian is a Kansas resident. Doc. 1 at ¶ 6. Kirkendall is a law firm based in Texas that specializes in personal injury and social security claims. *Id.* ¶ 8. Defendants EvolveTech Innovations and Evolve Tech Solutions are Indiana-based companies. *Id.* ¶¶ 10-13.[1]

Julian has a phone number that has been listed on the National Do-Not-Call Registry since April 25, 2006. *Id.* ¶ 14. Kirkendall contracted with and hired telemarketing companies, including the other defendants in this case, to solicit consumers for use of its services. *Id.* ¶ 16. Kirkendall authorized telemarketers to act as its agents. *Id.* ¶ 17. It has been alerted to TCPA violations and consumer complaints about telemarketing calls. *Id.* ¶¶ 18-19.

On July 28, 2025, Julian received a call that lasted over an hour and involved several transfers to different individuals about the purchase of various insurance plans. *Id.* ¶ 30. Later that day, at 3:03 p.m., Julian received a follow-up call from a telemarketer trying to sell final-expense insurance and pitch a Social Security Disability subsidy. *Id.* ¶ 31. Julian was subsequently transferred to "Sarah Bobb" from Kirkendall. *Id.* Julian later called Kirkendall directly and asked for "Sarah Bobb" to confirm she worked for Kirkendall. *Id.* He was transferred to someone named Cherise from Kirkendall's "intake department." *Id.* When Julian said he was not interested in any of Kirkendall's services and that the call was a TCPA violation, Cherise said someone from Kirkendall would call him back about the alleged TCPA violation. *Id.*

On July 31, 2025, Julian received a call from someone with EvolveTech, who tried to resolve the alleged TCPA violation. *Id.* ¶ 42. Julian said he was represented by counsel. *Id.* Later that day, another telemarketer from EvolveTech, who also identified herself as a vendor of Kirkendall, called to see if Julian would settle the dispute. *Id.* ¶ 43. The caller referenced

---

[1]  EvolveTech Innovations and Evolve Tech Solutions have not yet appeared in the case. The status of service of those parties is not entirely clear.

Kirkendall. *Id.*[2] Another telemarketing call came on August 1, 2025, trying to resolve the alleged TCPA violation. *Id.* ¶ 44.

Despite requests to be removed from call lists, Julian was harassed by multiple telemarketers soliciting final-expense insurance, health plans, and Social Security Disability subsidies on behalf of Kirkendall. *Id.* ¶ 45. Julian attached to his complaint a list of 20 telemarketing calls by Kirkendall to his cell phone between July 28, 2025, and August 1, 2025, that all followed a similar script. *Id.* ¶ 46; *see also* Doc. 1-2. He also contends that from May 2025 through August 2025, he received a total of 40 calls attributable to Kirkendall and its telemarketers soliciting him to purchase final-expense insurance and health insurance plans, or soliciting him to apply for Medicare or Social Security subsidies. Doc. 1 at ¶¶ 2, 21. Julian contends he "linked" all these telephone solicitations to Kirkendall in July 2025 after discussions with the telemarketers, *id.* ¶ 2 n.1, by comparing the "unique call signatures," *id.*, and by providing enough information during calls so that he would be connected with an agent or employee of Kirkendall, *id.* ¶ 28. The calls used a similar telemarketing script, including asking him about his information, health ailments, and whether he was taking medications or was disabled. *Id.* ¶¶ 24-25, 46, 48.

On July 28, 2025, Julian emailed Andrew Kirkendall and Alexander Dwyer of the Kirkendall firm. *Id.* ¶ 49. On July 31, 2025, Julian and Andrew Kirkendall received an email from EvolveTech, stating that their legal compliance team was reviewing the matter and taking steps to ensure Julian was placed on an internal do-not-call list. *Id.* ¶ 50. The email from EvolveTech addressed Andrew Kirkendall specifically and said, "Andrew, we appreciate your transparency and continued partnership." *Id.* (emphasis omitted).

---

[2]    This part of the complaint is somewhat unclear. It says: "When Plaintiff asked whether she [the telemarketer] is part of EvolveTech and she admitted that she is. Plaintiff asserted that this lawsuit would put her out of business but also said she works with [Kirkendall] and 'wants to help them out with this.'" Doc. 1 at ¶ 43 (emphasis omitted).

Julian has no relationship with Kirkendall or its telemarketers and has never been a customer of them. *Id.* ¶ 22. He has never consented to receiving any of the telemarketing calls and has told them not to call him. *Id.* The calls were generated using an automated dialing system. *Id.* ¶ 25. The caller ID was modified to conceal the identity of the caller. *Id.* ¶ 26. The telemarketer would either not identify the company doing the soliciting or would give a false name. *Id.* ¶ 27.

Julian alleges an agency relationship existed between Kirkendall and the telemarketers. *Id.* ¶ 63. Kirkendall controlled the manner and means by which the telemarketers made their calls and gave them authority to make the calls. *Id.* ¶¶ 64-68. The telemarketers marketed Kirkendall's services. *Id.* ¶ 70. Kirkendall has known its telemarketers violate the TCPA but has not taken steps to end the telemarketing campaign. *Id.* ¶¶ 73-74. Julian alleges "[u]pon information and belief" that Kirkendall "is responsible for its Telemarketers' marketing campaign and it either initiated the telemarketing campaign or allowed it to continue because it benefits [Kirkendall] financially." *Id.* ¶ 77.

Julian asserts three counts under the TCPA and one count under the KCPA. *Id.* ¶¶ 80-100.

## II.    STANDARD

A complaint survives a Rule 12(b)(6) motion to dismiss when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation and citation omitted). A claim is plausible if there is sufficient factual content to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation and citation

omitted). A court must accept as true all well-pleaded allegations in the complaint, but it does not accept legal conclusions or conclusory statements. *Id.* at 678-79.

Dismissal under Rule 12(b)(6) may also be warranted where an issue of law precludes recovery. *Jones v. Addictive Behav. Change Health Grp., LLC*, 364 F. Supp. 3d 1257, 1265 (D. Kan. 2019).

### III.    ANALYSIS

Kirkendall moves to dismiss. It makes two arguments. First, it argues that Julian's allegations against it are not plausible because there is an "obvious alternative explanation" that the calls were made not by it, but by an insurance company. Second, Kirkendall argues that Julian's KCPA claim fails because violations of the no-call act are only actionable if they involve a "consumer transaction" and insurance contracts are excluded from the definition of "consumer transaction."

#### A.    Plausibility

Kirkendall's first argument is that Julian's TCPA claims are not plausible because an "obvious alternative explanation" is that some entity other than Kirkendall made the calls. Julian alleges over 40 calls were made but only two mentioned Kirkendall, and one of those two was to discuss Julian's complaints about a TCPA violation. Julian links the other calls he received to Kirkendall based on the similar "fingerprint" of those calls to the ones that mentioned Kirkendall. But Kirkendall argues that Julian has sued two insurance companies for TCPA violations,[3] and the calls in those cases also involved the same "fingerprint" of the calls here (i.e. asking Julian for his name, date of birth, address, health ailments, and insurance needs). Thus, according to Kirkendall,

---

[3]    Kirkendall argues the Court can take judicial notice of those lawsuits and thus they are properly considered in deciding the Rule 12(b)(6) motion. Doc. 12 at 4-5. The Court need not decide that question. Even if those lawsuits were considered, Julian's complaint plausibly connects more than one of the calls to Kirkendall, and the fact of the other lawsuits does not overwhelm the allegations here.

the "obvious alternative explanation" is that the calls Julian complains of in this case are attributable to some unknown insurance company, rather than to Kirkendall.

Julian argues in response that the complaint alleges that he received more than one phone call within a 12-month period by or on behalf of Kirkendall in violation of the TCPA. Specifically, the complaint alleges he received over 40 calls to his cell phone, which he linked to Kirkendall by engaging in conversations with the telemarketers. On one occasion, he was transferred to someone with Kirkendall, and on another occasion, he was contacted by a telemarketer who identified herself as a vendor of Kirkendall. All the other calls followed a similar script to the calls linked to Kirkendall. When Julian reached out to EvolveTech to complain about the calls via email, EvolveTech responded and included a message to Andrew Kirkendall expressing appreciation for Kirkendall's "continued partnership." Doc. 1 at ¶ 50.

The Court finds Julian has the better argument at this stage. The TCPA creates a private cause of action for any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." *Schmitendorf v. Juicy's Vapor Lounge, Inc.*, 2025 WL 2966205, at *3 (D. Kan. 2025) (quoting 47 U.S.C. § 227(c)(5)).[4] Here, Julian has identified at least one call directly linked to Kirkendall. Doc. 1 at ¶ 31. In another call, a representative of EvolveTech said she was Kirkendall's vendor.[5] *Id.* ¶ 43. And in trying to resolve Julian's complaints, EvolveTech

---

[4]  Some of Julian's claims have additional elements. The parties don't distinguish among the three TCPA claims or make arguments about whether Julian otherwise satisfies the elements of each of the TCPA claims. Instead, they focus on whether Julian has plausibly attributed more than one call to Kirkendall. The Court focuses its analysis there as well and will assume without deciding that all other elements are satisfied.

[5]  Even accepting Kirkendall's argument that this call could not be a TCPA violation because it was done with Julian's consent, *see* Doc. 21 at 2, this fact can still connect Kirkendall to the calls. Kirkendall does not meaningfully dispute the allegation that EvolveTech was its vendor, nor does it dispute that many of or all the 40 other calls apparently involved EvolveTech. Kirkendall does try to suggest that EvolveTech being Kirkendall's vendor does not mean EvolveTech was calling on behalf of Kirkendall. Doc. 12 at 6. But it does not explain this distinction, nor is it persuasive at the pleading stage.

acknowledged the "continued partnership" between it and Kirkendall. *Id.* ¶ 50. The calls also all followed a similar format. *Id.* ¶¶ 24-25, 46, 48. These are sufficient facts to make it plausible that at least more than one of the 40 calls Julian complains about were made by or on behalf of Kirkendall.

Kirkendall argues that an obvious alternative explanation to it being responsible for the calls—at least the calls not directly linked to it—is that someone else probably made them. Allegations may not be plausible "if an obvious alternative explanation overwhelms any plausible inference" of the alleged wrongdoing. *Cavlovic v. J.C. Penney Corp., Inc.*, 2018 WL 2926433, at *5 (D. Kan. 2018). "When a complaint presents a plausible inference of liability, the degree of plausibility only becomes relevant when an obvious alternative explanation overwhelms any inference that liability might exist." *Id.* at *4 (emphasis omitted).

Kirkendall focuses only on the allegation about the similar "fingerprint" of the calls. It contends Julian has brought other TCPA cases that alleged similar calls with similar "fingerprints." According to Kirkendall, if the source of the calls in Julian's other cases were insurance companies (as Julian alleged in those cases), it is likely that some unnamed insurance company is also responsible for the calls here—the alleged "obvious alternative explanation."

But this ignores Julian's other allegations about Kirkendall's involvement, like the fact that Kirkendall is mentioned in two calls, used EvolveTech as a vendor, and had a "continued partnership" with EvolveTech. Kirkendall repeatedly asks why a law firm would hire telemarketers to sell insurance products. This is perhaps a fair question (though it seems to ignore Kirkendall's apparent involvement with at least some of the calls). But that question does not overwhelm Julian's otherwise plausible allegations linking the calls to Kirkendall. Certainly, it might ultimately prove to be the case that some entity unrelated to Kirkendall made all the calls

complained of by Julian in this case. "But absent an 'obvious' alternative explanation, it is not for the court to decide on a 12(b)(6) motion which is more likely between two plausible inferences that may equally be drawn from the factual allegations in a complaint." *Id.*

Kirkendall's motion is denied on this point.

**B.      KCPA Claim**

In Count IV, Julian alleges a violation of the KCPA based on telemarketing calls made to him while his number was on the do-not-call list. Doc. 1 at ¶¶ 98-100. Kirkendall argues Julian cannot bring a KCPA claim because the calls related to insurance, which are not "consumer transactions" under the KCPA. Julian responds that his KCPA claim is brought under the Kansas No-Call Act and is not in relation to an insurance contract.

This involves the relationship of the Kansas No-Call Act to the KCPA. Under K.S.A. § 50-670a(c), telephone solicitors may not "make or cause to be made any unsolicited consumer telephone calls to any consumer if the consumer's telephone number or numbers appear on the no-call list." A consumer telephone call is one made "for the purpose of soliciting a sale of any property or services to the person called . . . ." K.S.A. § 50-670(a)(1).[6] "Any violation of [K.S.A. § 50-670a] is an unconscionable act or practice under the Kansas consumer protection act." K.S.A. § 50-670a(g).

Under the KCPA, "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." K.S.A. § 50-627(a). A "'consumer transaction' means a sale, lease, assignment or other disposition for value of property or services within this state, except insurance contracts regulated under state law, to a consumer; or a solicitation by a supplier with

---

[6]    A consumer telephone call is unsolicited unless it was made in response to an express request or by express agreement, is in connection with an existing debt, or is to someone with whom the caller has an established business relationship. K.S.A. § 50-670(a)(3).

respect to any of these dispositions." K.S.A. § 50-624(c). Thus, "the KCPA expressly excludes insurance contracts from the scope of consumer transactions." *Logan v. Farmers New World Life Ins. Co.*, 2023 WL 2730109, at *2 (D. Kan. 2023).

Kirkendall relies on these provisions to conclude the following: (1) unsolicited calls to someone on the do-not-call list is an unconscionable act in Kansas, (2) the KCPA prohibits unconscionable acts in connection with consumer transactions, (3) consumer transactions do not include the sale or solicitation of insurance contracts, and (4) therefore, it is not a violation of the KCPA to call someone on the do-not-call list if the call is about insurance (even if the call is unsolicited).

Kirkendall relies on *Wright v. Enhanced Recovery Company, LLC*, 227 F. Supp. 3d 1207 (D. Kan. 2016), to support its position that the Kansas No-Call Act "depends on definitions from the general KCPA." *See* Doc. 21 at 6-7. In *Wright*, the plaintiff alleged a violation of the KCPA based on unsolicited debt-collection calls. 227 F. Supp. 3d at 1211-12. Because the Kansas No-Call Act did not have its own definition of "consumer," the court looked to the definition of that term in the KCPA, which the plaintiff did not meet. *Id.*[7] The court further found the claim failed under the Kansas No-Call Act because (1) the calls were not "consumer calls" as that term is defined in the Kansas No-Call Act, and (2) that statute carves out calls made about existing debt from the definition of "unsolicited consumer telephone call." *Id.* at 1212 (citing K.S.A. § 50-670). The court accordingly found the KCPA claim was precluded, even to the extent it was based on the Kansas No-Call Act. *Id.*

---

[7]  The plaintiff in *Wright* was not a consumer because "he never sought to buy goods or services and was never solicited to do so." 227 F. Supp. 3d at 1211 (explaining that under the KCPA a consumer is someone "who seeks or acquires property or services for personal, family, household, business or agricultural purposes" (quoting K.S.A. § 50-624(b))). The calls in *Wright* were to a wrong number about debt collection. *Id.*

Kirkendall argues *Wright* is on point, with the only difference being that the definition at issue in *Wright* was "consumer," while here it is "consumer transaction." Doc. 21 at 6-7. But Kirkendall's reliance is somewhat misplaced. First, the calls in *Wright* did not meet the plain language of the Kansas No-Call Act because they were about existing debt, which are not considered "unsolicited consumer calls" under the definition in the Kansas No-Call Act. 227 F. Supp. 3d at 1212; *see also* K.S.A. § 50-670(a)(3)(B). Second, the court in *Wright* imported definitions from the KCPA to terms used in the Kansas No-Call Act. Here, Kirkendall seeks to import the KCPA's definition of the term "consumer transaction" onto Julian's claim based on the Kansas No-Call Act even though that term is not used in the Kansas No-Call Act.

Kirkendall's argument that insurance calls are exempt from the Kansas No-Call Act also seems contrary to the language of the Kansas No-Call Act. The Kansas No-Call Act says it applies to consumer telephone calls, which that statute defines as calls "for the purpose of soliciting a sale of <u>any</u> property or services to the person called." K.S.A. § 50-670(a)(1) (emphasis added). The Kansas No-Call Act further prohibits solicitors from making "<u>any</u> unsolicited consumer telephone calls" to any number on the no-call list. K.S.A. § 50-670a(c) (emphasis added). There is no carveout for unsolicited calls about insurance. So, although the KCPA limits claims to those arising from "consumer transactions," which does not include insurance contracts, it's not clear whether that limit extends to claims based on violations of the Kansas No-Call Act. Kirkendall does not cite any cases interpreting these statutes this way, nor does it meaningfully engage with the statutory language.[8]

---

[8]   Kirkendall cites two cases applying the insurance carveout for KCPA claims, but those cases didn't involve the Kansas No-Call Act. *See Logan*, 2023 WL 2730109, at *2; *Moore v. The Climate Corp.*, 2016 WL 4527991, at *9 (D. Kan. 2016). The Court also notes that Kirkendall did not cite or discuss *Wright* until its reply brief, so Julian has not been heard on that issue.

Making insurance calls immune from the Kansas No-Call Act would be a significant carveout of that statute. Perhaps on a more developed record and with more fulsome briefing, Kirkendall may be able to prevail on this argument. But Kirkendall has not carried its burden at this stage; the Court cannot find that Julian's KCPA claim is barred as a matter of law because some of the calls were about insurance.[9]

## IV. CONCLUSION

THE COURT THEREFORE ORDERS that Kirkendall's Motion to Dismiss (Doc. 12) is DENIED.

IT IS SO ORDERED.

Dated: March 12, 2026                    /s/ *Holly L. Teeter*
                                         HOLLY L. TEETER
                                         UNITED STATES DISTRICT JUDGE

---

[9]  It is not clear from the complaint that all the calls at issue involved insurance. At least some involved Social Security benefits. *See, e.g.*, Doc. 1 at ¶¶ 31, 33, 38, 45. The parties don't discuss this.